[No. 85177-8.   En Banc.]

Argued September 15, 2011.    Decided December 15, 2011.

LOUISE LAUER ET AL., *Petitioners*, v. PIERCE
COUNTY ET AL., *Respondents*.

*Margaret Y. Archer*, for petitioners.

*Mark E. Lindquist, Prosecuting Attorney*, and *Jill Guernsey, Deputy*, for respondent Pierce County.

*Gregory A. Jacoby* and *Jennifer A. Irvine Forbes* (of *McGavick Graves PS*), for respondents Mike and Shima Garrison and Betty Garrison.

¶1 OWENS, J. — Louise Lauer and Darrell de Tienne separately own properties that neighbor a lot owned by Mike and Shima Garrison. Through a Land Use Petition Act (LUPA) petition, chapter 36.70C RCW, Lauer and de Tienne challenge a fish and wildlife variance granted to the Garrisons by Pierce County (the County) to build a single family residence within the protective buffer zone of a stream that runs across the Garrisons' property. The central issue before us is whether the Garrisons' rights vested in 2004 when they submitted their building application. The Garrisons also raise questions about the standing and timeliness of Lauer and de Tienne's claim, as well as whether the relevant critical area regulation even applies to the Garrisons' shoreline property. We hold that Lauer and de Tienne properly petitioned the superior court for review and that, because the Garrisons' building permit application contained misrepresentations of material fact, the Garrisons' rights did not vest in 2004.

## FACTS

¶2 In December 2002, the Garrisons purchased a water-front parcel of property on Henderson Bay in Gig Harbor, Washington. The property included an existing single-family residence. A Department of Natural Resources (DNR) type 4 or type 5 watercourse—specifically, a non-fish-bearing stream—runs southward across the southwest portion of the Garrisons' property. Petitioners Lauer and de Tienne are the Garrisons' neighbors to the east and west, respectively.

¶3 A few months after purchasing their property, the Garrisons illegally cleared vegetation from within the property's watercourse and its buffer. Former Pierce County Code (PCC) 18E.60.050(C), (D) (1997) required a 35-foot-wide buffer on both sides of "DNR Water Type 1 through 5" rivers and streams and an 8-foot-wide setback from the buffer for any construction over a certain size. *See also* Pierce County Ordinance 97-84, § 8 (Dec. 30, 1997). Current regulations require that the buffer be at least 65 feet wide. PCC 18E.40.060(B)(3).[1] Upon receiving a complaint about the clearing, the County investigated and issued a stop work order on March 7, 2003, instructing the Garrisons to stop clearing and requiring that they revegetate the area. As part of that process, the Garrisons submitted a planting plan to the County, including a diagram of their property, which depicted the "existing drainage" and, north of that, an "existing trail." Clerk's Papers at 96-98.

¶4 In March 2004, the Garrisons filed a building permit application for a single-family residential dwelling between their existing home and the shoreline. The site plan diagram submitted with the application did not label the watercourse or its buffer and mislabeled the trail as an

---

[1] A type 4 watercourse is now "Type N1," which requires a 115-foot buffer; a type 5 watercourse is now "Type N2," which requires a 65-foot buffer. PCC 18E.40.060(B)(3) n.1.

"existing drive."[2] Administrative R. (AR) at 263. The proposed residence was squarely within the 35-foot buffer of the watercourse. The County approved the permit, and the Garrisons began construction. In October 2004, the County conducted another site visit and issued another cease and desist order because the Garrisons were building within the drainage buffer. The building permit was suspended, and the Garrisons were directed to apply for a fish and wildlife variance within 60 days.

¶5 Instead, the Garrisons challenged the cease and desist order, and the County held a hearing on the matter. The Garrisons specifically claimed that a stream did not exist on their property and, alternatively, if it did, it was actually drainage that was illegally directed onto their parcel by de Tienne. A hearing examiner denied the Garrisons' claim, upholding the cease and desist order. The hearing examiner found that "[t]he drainage course [on the Garrisons' property] meets the definition of a DNR Type 4 or 5 watercourse and therefore requires a 35 foot wide, undisturbed buffer." AR at 90. The hearing examiner also found that

> the 2003 site plan prepared by the appellants in response to a Pierce County enforcement action regarding illegal clearing shows a "trail" alongside the drainage course in the same location as the "existing drive." Numerous exhibits and substantial testimony show that a trail and not a "drive" existed historically along the east side of the drainage course. *Appellants cannot, therefore, assert that they justifiably relied upon the Pierce County inspector's approval of the footing location.*

*Id.* at 98 (emphasis added). The Garrisons' motion for reconsideration was denied.

---

[2] At the time of the building application, the County had an exception to the buffer requirement, which stated that "[t]he buffer of a . . . stream shall not extend landward beyond an existing substantial improvement such as an improved road, dike, levee, or a permanent structure which reduces the impact proposed activities would have on the . . . stream." Former PCC 18E.60.050(A)(2) (1997). The significance of this regulation related to the misrepresentation of an existing drive is that, even had the County recalled the existence of the protected stream on the Garrison property, the existence of a "drive," an existing substantial improvement, would have negated the buffer requirement.

¶6 The Garrisons appealed the hearing decision to the superior court in a LUPA petition. According to the Garrisons, they voluntarily withdrew the petition based on an agreement with the County that they could "seek a variance and the County would process the variance under the regulations that were in effect in 2004." Br. of Appellants Garrison at 8-9. Neither the LUPA petition nor the supposed agreement is part of the record before us, and therefore, we do not consider them.

¶7 Effective on March 1, 2005, the County changed the required buffer for streams like the one on the Garrisons' property from 35 feet to 65 feet. Pierce County Ordinance 2004-56s, § 4 (Oct. 19, 2004) (codified as PCC 18E.40.060(B)(3)). Besides the buffer increase, the County's requirements for acquiring a variance also became more stringent. *Compare* former PCC 18E.10.070(D)(4) (1997), *with* PCC 18E.40.060(C)(2).

¶8 On August 9, 2007, over two years after the buffer and variance criteria changes, the Garrisons filed for a fish and wildlife variance. Lauer and de Tienne participated in the hearing, opposing the variance. In particular, Lauer and de Tienne argued that the applicable provisions for determining whether to grant the variance were the current regulations, not those in effect when the building permit was submitted in 2004. At the hearing, the County supported the Garrisons' efforts to get a variance, agreeing that the Garrisons' rights vested in 2004.

¶9 Following the hearing, a county deputy hearing examiner applied the 2004 regulations, finding that the Garrisons' rights had vested in March 2004, and approved the variance in December 2007. Lauer and de Tienne filed a request of reconsideration of the variance decision, which was denied on March 4, 2008.

¶10 Lauer and de Tienne then filed a LUPA petition on March 27, 2008, with the Pierce County Superior Court, pursuant to chapter 36.70C RCW. In August 2008, the superior court reversed the hearing examiner's decision to

grant the Garrisons' variance based on regulations in effect at the time the building permit was submitted. The superior court held that Lauer and de Tienne were not barred from bringing the suit and that the hearing examiner erroneously applied the law to the facts when he found the Garrisons' March 2004 building permit application to be complete. The Garrisons appealed. The Court of Appeals held that the building permit application was complete as a matter of law under RCW 36.70B.070(4)(a). *Lauer v. Pierce County*, 157 Wn. App. 693, 709, 238 P.3d 539 (2010). Lauer and de Tienne sought, and we granted, discretionary review. *Lauer v. Pierce County*, 171 Wn.2d 1008, 249 P.3d 182 (2011).

## ANALYSIS

¶11 Judicial review of land use decisions is governed by LUPA. *Abbey Rd. Grp., LLC v. City of Bonney Lake*, 167 Wn.2d 242, 249, 218 P.3d 180 (2009). LUPA authorizes the reversal of a local land use decision if the party seeking relief carries the burden of establishing one of six statutorily enumerated standards. RCW 36.70C.130(1).

¶12 In this case, the following three standards are implicated:

> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

> (d) The land use decision is a clearly erroneous application of the law to the facts.

*Id.* Whether a decision involves an erroneous interpretation of the law under standard (b) is a question of law that courts review de novo. *Abbey Rd. Grp.*, 167 Wn.2d at 250. The substantial evidence standard of review, under standard (c), requires the court to determine whether a fair-

minded person would be persuaded by the evidence of the truth of the challenged findings. *Id.* Under this standard, the court "consider[s] all of the evidence and reasonable inferences in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority." *Id.* Finally, under standard (d), a decision is clearly erroneous if, "although there is evidence to support it, the reviewing court on the record is left with the definite and firm conviction that a mistake has been committed." *Phoenix Dev., Inc. v. City of Woodinville*, 171 Wn.2d 820, 829, 256 P.3d 1150 (2011).

¶13 We now sit in the same position as the superior court and generally confine our consideration to the administrative record before the hearing examiner. *HJS Dev., Inc. v. Pierce County ex rel. Dep't of Planning & Land Servs.*, 148 Wn.2d 451, 468, 61 P.3d 1141 (2003). We hold that Lauer and de Tienne have carried their burden of establishing that the land use decision to grant a variance involved an erroneous interpretation of the law, pursuant to RCW 36.70C.130(1)(b).

I.   Standing

¶14 The Garrisons challenge whether Lauer and de Tienne have standing to file a LUPA petition and whether, once challenged in Pierce County Superior Court, Lauer and de Tienne were permitted to support their standing with facts that were not already contained in the administrative record. We affirm the superior court's finding that Lauer and de Tienne have standing.

¶15 Under LUPA, a person other than the owner of the property that is the subject of the land use decision has standing if that person is or would be "aggrieved or adversely affected" by the decision. RCW 36.70C.060(2). A person is "aggrieved or adversely affected" when (1) the person is prejudiced or likely to be prejudiced by the decision, (2) the local jurisdiction was required to consider that person's asserted interests in making its decision, (3) a

favorable judgment would redress or substantially eliminate the prejudice, and (4) the person has exhausted her administrative remedies. *Id.*

¶16 As a preliminary matter, the Garrisons argue that the superior court erred in considering evidence of Lauer and de Tienne's standing that was not in the administrative record. This challenge is easily rejected based on the plain statutory language of LUPA. First, a LUPA petitioner must establish facts supporting standing. RCW 36.70C.070(6). This requirement plainly indicates that the legislature anticipated later consideration of facts related to judicial standing. Moreover, while judicial review of factual issues under LUPA is generally limited to the administrative record, the statute expressly provides that this limitation applies only when "the parties to the quasi-judicial proceeding had an opportunity consistent with due process to make a record on the factual issues." RCW 36.70C.120(1). Lauer and de Tienne participated in the administrative hearing, but the Garrisons never challenged their standing before the hearing examiner. As such, no record was developed on the question of standing; it simply was not a relevant issue at the hearing. Because there was no opportunity to make a record on the issue, "the record for judicial review may be supplemented by evidence of material facts that were not made part of the local jurisdiction's record." RCW 36.70C.120(3).

¶17 The Garrisons also challenge each of the conditions necessary for standing. Lauer and de Tienne satisfy each of the conditions and therefore have standing. First, Lauer and de Tienne have established that they have been or would be prejudiced. An adjacent landowner who alleges the proposed project will injure his or her property has standing. *Chelan County v. Nykreim*, 146 Wn.2d 904, 934-35, 52 P.3d 1 (2002). Here, Lauer and de Tienne own properties adjacent to the Garrisons' property, and they allege that the clearing and development within the buffer zone that have already occurred and that would be permit-

ted by the variance have already caused specific injuries and will further injure their properties.

¶18 Second, Lauer and de Tienne's interests are those that the local government is required to consider. Local law provides that adjacent property owners are to be notified about an application for a variance allowing a buffer reduction and that there be a public hearing. PCC 18.80.020. This indicates that the local government is committed to considering Lauer and de Tienne's interests as neighboring property owners when considering the request for a variance. Thus, the second condition is met.

¶19 Third, the requested relief would eliminate or redress the prejudice asserted by Lauer and de Tienne. Consideration of the variance under the current variance standards would assure that Lauer and de Tienne's interests are more protected, again because the new standards are stricter and look to more factors. *Compare* former PCC 18E.10.070(D)(4) (1997), *with* PCC 18E.40.060(C)(2).

¶20 Finally, Lauer and de Tienne have exhausted their administrative remedies. The Garrisons specifically argue that Lauer and de Tienne failed to exhaust administrative remedies when they did not challenge the "final determination" that the building permit application was complete, which the Garrisons allege happened in 2004. *See* RCW 36.70C.020(2) (" 'Land use decision' means a final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination, including those with authority to hear appeals."). However, Lauer and de Tienne had to exhaust only the administrative remedies that were available to them. *See Citizens for Mount Vernon v. City of Mount Vernon*, 133 Wn.2d 861, 868-71, 947 P.2d 1208 (1997) (holding that where the only administrative remedy available was participation in a public hearing, and where the petitioners participated, they satisfied the exhaustion requirement). "The [LUPA] statute states nothing of the degree of participation or the specificity with which issues must be raised to seek judicial review." *Id*. at 868.

There is no indication that Lauer and de Tienne were given notice of the building permit application or its approval. They did, however, participate in the hearing where the Garrisons appealed the cease and desist order. At that point, the determination of whether the application was complete was not a relevant issue. Lauer and de Tienne participated at the administrative level regarding the relevant issues.

¶21 The administrative process affirmed the cease and desist order, which prevented the Garrisons from building within the buffer zone without a variance. Ultimately, there was no further administrative action for Lauer and de Tienne to take; their position prevailed. The Garrisons suggest that Lauer and de Tienne were required to intervene in the Garrisons' LUPA petition, but this is not an *administrative* remedy. "The rationale for the exhaustion requirement is that the administrative officer or agency may possess special expertise necessary to decide the issue, and that an administrative remedy may obviate the need for judicial review." *Valley View Indus. Park v. City of Redmond*, 107 Wn.2d 621, 633, 733 P.2d 182 (1987). This does not require parties to participate in litigation. Once they learned of the Garrisons' construction plan, Lauer and de Tienne fully participated in every step of *administrative* review related to this case, exhausting all remedies.

## II. Timeliness

¶22 The LUPA petition was timely filed. To be timely, a petition must be filed within 21 days of the relevant land use decision, including a ruling on a motion for reconsideration. RCW 36.70C.040(3); *Mellish v. Frog Mountain Pet Care*, 172 Wn.2d 208, 257 P.3d 641 (2011). This petition was filed 20 days after the motion for reconsideration was denied. Therefore, the petition was timely.

## III. Equitable Estoppel

¶23 The Garrisons assert that Lauer and de Tienne are equitably estopped from raising the claims asserted in

their LUPA petition because they did not intervene in the Garrisons' LUPA petition, appealing the cease and desist order. This is another claim related to the failure of Lauer and de Tienne to take further action prior to the variance hearing. The Garrisons misunderstand the doctrine of equitable estoppel, and we hold that Lauer and de Tienne are not equitably estopped from arguing the claims in their LUPA petition.

> To establish equitable estoppel requires proof of (1) an admission, statement or act inconsistent with a claim later asserted; (2) reasonable reliance on that admission, statement, or act by the other party; and (3) injury to the relying party if the court permits the first party to contradict or repudiate the admission, statement or act.

*Dep't of Ecology v. Theodoratus*, 135 Wn.2d 582, 599, 957 P.2d 1241 (1998). It is not clear what statement that Lauer and de Tienne allegedly made that the Garrisons relied on. Rather, the Garrisons seek to bind Lauer and de Tienne to the County's statement, though not in the record, that the variance request would be considered under 2004 law.

¶24 Lauer and de Tienne are not equitably estopped from making their claims herein because they made no statement that the Garrisons could have relied on. The alleged statement made by the County is not even included in the record. Moreover, "where the representations allegedly relied upon are matters of law, rather than fact, equitable estoppel will not be applied." *Id*. Whether rights pursuant to a land use application vest is a question of law as raised in this case. No major factual disputes exist—only questions of statutory interpretation. Accordingly, equitable estoppel does not apply.

IV. *Futurewise*

¶25 The Garrisons also preliminarily assert that Lauer and de Tienne's claim is moot as a result of this court's decision in *Futurewise v. Western Washington Growth Management Hearings Board*, 164 Wn.2d 242, 189

P.3d 161 (2008). In *Futurewise*, a plurality of this court held that critical areas within the jurisdiction of the Shoreline Management Act of 1971, chapter 90.58 RCW, are governed only by that act, not by local critical area regulations adopted pursuant to the Growth Management Act, chapter 36.70A RCW, or those still pending approval by the Department of Ecology (Department). *Futurewise*, 164 Wn.2d at 244-45. "A plurality opinion has limited precedential value and is not binding." *In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 302, 88 P.3d 390 (2004). Thus, *Futurewise* was never binding.

¶26 Since *Futurewise*, the legislature amended the law, clarifying its intent that critical area regulations apply to shoreline properties pending action by the Department. LAWS OF 2010, ch. 107, § 1. The Garrisons allege that the regulations do not apply, absent approval by the Department, which did not occur until after the variance hearing. The legislature stated that it "intends for this act to be remedial and curative in nature, and to apply retroactively to July 27, 2003." LAWS OF 2010, ch. 107, § 1(4).[3] With the new legislative amendments, *Futurewise* does not render Lauer and de Tienne's claim moot. The County's critical area regulations applied to the Garrisons even prior to the Department's approval of the local shoreline regulations.

V. Vesting

¶27 Washington recognizes a "date certain" standard for vesting. *Abbey Rd. Grp.*, 167 Wn.2d at 251. Developers are entitled to the benefit of "the regulations in effect at the time a complete building permit application is filed, regardless of subsequent changes in zoning or other land use regulations." *Id.* at 250. In Washington, the vesting rule

---

[3] Moreover, though a challenge to the retroactive nature of the law was not raised or briefed in this case, it is notable that the Court of Appeals thoroughly analyzed the retroactive application of the legislature's amendments following *Futurewise*. *See Kitsap Alliance of Prop. Owners v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 160 Wn. App. 250, 258-59, 255 P.3d 696, *review denied*, 171 Wn.2d 1030, 257 P.3d 662 (2011). The Court of Appeals held that the new law does "not contravene an existing judicial interpretation of the statute." *Id.* at 264.

originated as a common law doctrine and was later codified by the legislature. *Erickson & Assocs. v. McLerran*, 123 Wn.2d 864, 867-68, 872 P.2d 1090 (1994).

¶28 Regarding building permits, RCW 19.27.095 provides in relevant part:

(1) A valid and fully complete building permit application for a structure, that is permitted under the zoning or other land use control ordinances in effect on the date of the application shall be considered under the building permit ordinance in effect at the time of application, and the zoning or other land use control ordinances in effect on the date of application.

(2) The requirements for a fully completed application shall be defined by local ordinance.

The common law required only that an application be "sufficiently complete," while the legislature decided that the application must be "fully complete." *Compare id.*, *with Valley View Indus. Park*, 107 Wn.2d at 638. The legislature abrogated the common law rule when it substituted "fully" for "sufficiently," "taking a 'zero tolerance' approach to completeness." *Friends of the Law v. King County*, 123 Wn.2d 518, 524 n.3, 869 P.2d 1056 (1994).

¶29 The legislature made the definition of "a fully completed application" contingent upon local law. RCW 19.27.095(2). Since at least 1999, the County has defined completeness for vesting purposes related to a building permit application as follows: "Pursuant to RCW 19.27.095, a fully complete building permit application shall be any application including payment of all required fees and containing all the components that are applicable in Table 17C.10-1-H. Incomplete applications shall not be accepted." PCC 17C.10.140; *see also* Pierce County Ordinance 99-24s, Ex. C (Sept. 28, 1999) (codified as former PCC 17C.20.160 (1999)). The referenced table requires, in relevant part, that a building permit application include a site plan that in turn includes "all set backs from buildings." PCC 17C.10.140, tbl. 17C.10-1-H; *accord* former PCC 17C.20.160, tbl. 17.20-1-

-A-9. The same table also requires that "[a]ny land use permits required to approve the building permit application shall be applied for prior to or with the building permit application." PCC 17C.10.140, tbl. 17C.10-1-H.

¶30 Looking just to the definition of "a fully completed application" in Pierce County law, the Garrisons' application was not fully completed. The site plan in their building permit application omitted required elements and falsely represented the site where they proposed to build the new house. The site plan did not include the stream running through their property, the required buffer on both sides of the stream, or the required setback from the buffer of the residence that they proposed building.[4] In fact, they proposed building a new home within the buffer zone but without indicating the protected nature of the site. The Garrisons, while they may have disputed the determination of the waterway as a protected stream, knew or should have known of the requirement for the buffer based on previous rulings by the County. The Garrisons also falsely represented in their site plan that there was an "existing drive" where in fact there was only a trail. This is significant in that the existing development regulation at the time the building permit was submitted reduced the buffer requirement starting at the point of existing development. Former PCC 18E.60.050(A)(2) (1997). Accordingly, even if the county officials who reviewed the building permit application were aware of the stream and need for a buffer, the existence of a drive would have eliminated that concern.

¶31 Finally, in addition to the misrepresentations in the site plan, the Garrisons did not apply for a variance "prior to or with the building permit application." PCC 17C.10.140, tbl. 17C.10-1-H; *accord* former PCC 17C.20.160, tbl. 17.20-

---

[4] The Garrisons make much of the fact that Lauer and de Tienne entered only the site plan, not the entire building permit application, into the record. Since the site plan is the major evidence of the Garrisons' omissions and misrepresentations, it is the most relevant evidence. The Garrisons do not assert that the alleged inaccuracies in the site plan were corrected somewhere else in their building permit application.

-1-A-9. Because county regulations required a 35-foot buffer from the stream and an 8-foot setback from the buffer to a building, former PCC 18E.60.050(C), (D), and because the Garrisons proposed building their house within that buffer zone, a variance was legally required in order to approve the building permit application. Accordingly, a variance application was required prior to or at the time of the building permit application for that application to be complete under local law.

¶32 Looking just to the plain language of RCW 19.27.095, and in turn to local law defining a complete application, the Garrisons' building permit application is not fully complete. However, the Garrisons argue that another statute, RCW 36.70B.070, controls, and that their rights vested by operation of law. Chapter 36.70B RCW was passed by the legislature in order to address the regulatory burden created by increased land use permit requirements with separate review processes, which "has significantly added to the cost and time needed to obtain local and state land use permits." RCW 36.70B.010(1), (3). This statute provides, in relevant part, that a project permit application will be deemed complete "if the local government does not provide a written determination to the applicant that the application is incomplete" within 28 days of receipt. RCW 36.70B.070(1), (4)(a). The Garrisons assert that their building application was made complete by operation of law. In other words, because the County did not inform them that their application was incomplete, it became complete, under RCW 36.70B.070(4)(a), sometime in April 2004. It is on this basis that the Court of Appeals reinstated the variance granted to the Garrisons. *Lauer*, 157 Wn. App. at 709.

¶33 Forcing this question of "completeness," however, ignores that under RCW 19.27.095, vesting requires more than full completeness. RCW 19.27.095(1) also requires that a building permit application be "valid" and "permitted under the zoning or other land use control ordinances in effect on the date of the application" in order to vest under

the law at the date of the application. *Cf.* RCW 58.17.033(1) (vesting statute for subdivision plats, which requires only that the application be "fully completed" to vest); *Friends of the Law*, 123 Wn.2d at 525 n.4 (interpreting RCW 58.17.033 to not require compliance with existing zoning ordinances in order to vest).

¶34 The Garrisons' 2004 building permit application did not comply with then-existing ordinances because the proposed project was squarely within the required 35-foot buffer of a type 4 or type 5 DNR water type stream. Because the building permit submitted in 2004 did not comply with ordinances in effect at the time of the application, the Garrisons' rights did not vest. *See Kelly v. Chelan County*, 157 Wn. App. 417, 425, 237 P.3d 346 (2010).

¶35 A permit application must also be valid. "Valid" is not defined by statute or in case law. *See Eastlake Cmty. Council v. Roanoke Assocs.*, 82 Wn.2d 475, 483, 513 P.2d 36 (1973) ("Since the permit grant itself was patently impermissible, we need not decide if the application was also defective."). The plain meaning of "valid" is "[l]egally sufficient" or "[m]eritorious." BLACK'S LAW DICTIONARY 1690 (9th ed. 2009). It is clear that the Garrisons were in violation of an existing ordinance and that they made knowing misrepresentations in their application. *See* AR at 33-36, 98. It is hard to conceive of any meaning of the term "valid" that would include knowing misrepresentations. By way of comparison, this court has previously required governments to act in good faith and not subvert the legitimate efforts of a developer to vest his or her rights. *See Valley View Indus. Park*, 107 Wn.2d at 638-39 (citing *Parkridge v. City of Seattle*, 89 Wn.2d 454, 465-66, 573 P.2d 359 (1978)). The requirement that a building application be "valid" assures that the good faith requirement is not only one way. Accordingly, under RCW 19.27.095, the Garrisons' rights did not vest because their building application, which contained knowing misrepresentations of material fact, was not valid.

¶36 Further, the Garrisons' interpretation of RCW 36.70B.070(4)(a) would yield a troubling result: building permit applicants could misrepresent facts on their application, and the County would have the daunting task of investigating every application to determine its accuracy within a 28-day period. Failure on the part of the County to do so would cause the dishonest applicants' rights to vest. This court has held "that statutes should receive a sensible construction to effect the legislative intent and . . . to avoid unjust . . . consequences." *State v. Vela*, 100 Wn.2d 636, 641, 673 P.2d 185 (1983). Under these unique facts, where the Garrisons have submitted knowing misrepresentations of fact, we hold that the Garrisons' building permit did not vest because it was not valid and did not comply with the regulations in place at the time it was submitted. Failure by the hearing examiner to consider these factors in his determination of when the Garrisons' rights vested was an erroneous interpretation of the law.

## CONCLUSION

¶37 We hold that Lauer and de Tienne have standing under LUPA, that they timely filed their petition, and that the issues that they raised therein have not been rendered moot by this court's holding in *Futurewise*. Finally, we hold that the Garrisons' rights did not vest when their building permit was filed in 2004. A permit application that is not allowed under the regulations in place at the time it is submitted and is issued under a knowing misrepresentation or omission of material fact confers no rights upon the applicant. We reverse the decision of the Court of Appeals.

MADSEN, C.J., and C. JOHNSON, ALEXANDER, CHAMBERS, FAIRHURST, J.M. JOHNSON, STEPHENS, and WIGGINS, JJ., concur.