[No. 29675-0-III.   Division Three.   May 3, 2012.]

THE DEPARTMENT OF ECOLOGY, *Appellant*, v. THE CITY OF SPOKANE VALLEY ET AL., *Respondents*.

*Robert M. McKenna, Attorney General*, and *Thomas J. Young* and *Laura J. Watson, Assistants*, for appellant.

*Cary P. Driskell, City Attorney*; *Michael F. Connelly* (of *Koegen Edwards LLP*); and *John F. Magnuson*, for respondents.

¶1 SIDDOWAY, J. — Since its adoption by voters 40 years ago,[1] the Shoreline Management Act of 1971 (SMA), chapter 90.58 RCW, has provided that no development may be undertaken on Washington shorelines unless consistent with the policy of the SMA and any local shoreline master program. RCW 90.58.140(1). The requirement is effectuated by requiring that anyone undertaking a substantial development on the shoreline first obtain a permit from the appropriate local jurisdiction. RCW 90.58.140(2). The definition of "substantial development" is subject to a dozen exceptions, one being "[c]onstruction of a dock . . . designed for pleasure craft only, for the private noncommercial use of the owner, lessee, or contract purchaser of single and multiple family residences" having a value, in the case of a freshwater dock, of less than $10,000. RCW 90.58.030(3)(e)(vii).

¶2 In this case we are called upon to decide whether the developer of 30 residential waterfront lots in the city of Spokane Valley is entitled to rely on this owner-noncommercial use exemption to construct docks appurtenant to the spec (speculative) homes it builds for resale and, if it is entitled to rely on the exemption, whether the city violated SMA policies by exempting 2 docks without imposing conditions to protect against the cumulative effects of a potential 30 docks. We find the first issue to be dispositive and hold that the statutory exemption applies only when the owner, lessee, or contract purchaser requests the permit in order to undertake construction for its own noncommercial use. We reverse the superior court's order denying Ecology's land use petitions.

## FACTS AND PROCEDURAL BACKGROUND

¶3 Coyote Rock Acres is a residential subdivision located alongside the Spokane River in the city of Spokane Valley,

---

[1] For the history of the shoreline measures submitted to voters in 1972, see Geoffrey Crooks, *The Washington Shoreline Management Act of 1971*, 49 WASH. L. REV. 423, 423-25 (1974).

platted to include 30 waterfront lots. The developer of the subdivision, to which we will refer as Coyote Rock,[2] triggered the city's first review of shoreline issues when it applied for a permit to grade most of the site for future development. Its environmental checklist and plans submitted under the State Environmental Protection Act (SEPA), chapter 43.21C RCW, proposed a 50-foot shoreline setback for the grading project that the Washington State Department of Fish and Wildlife (Fish & Wildlife) objected to as inadequate because the river and adjacent riparian area were very sensitive to disturbance.[3] After considering comments, the city issued a mitigated determination of nonsignificance for the grading and rehabilitation project requiring that Coyote Rock observe a 75-foot riparian setback from the ordinary high-water mark. The Washington State Department of Ecology endorsed the idea of increasing the setback to 75 feet and expressed its view that "[i]n order to be effective, [the] buffer must be absolutely undisturbed and undeveloped." Clerk's Papers (CP) at 221.

¶4 After consulting with Ecology, the city notified Coyote Rock that a shoreline substantial development permit would also be required for the portion of the grading work that would be performed within the shoreline area. Coyote

---

[2] The record reveals that several entities have been involved in the development and application process for Coyote Rock: Neighborhood Inc., the owner of the project; Monarch Development Inc. and Invest Northwest, which applied for several of the required permits on Neighborhood's behalf; and Coyote Rock LLC, which applied for the exemption from the SMA substantial development permit requirement. The separate character of the entities has not been an issue in connection with the dock exemption applications and Land Use Petition Act, chapter 36.70C RCW, actions. For simplicity's sake, we refer to the entities, interchangeably and collectively, as "the developer" or "Coyote Rock."

[3] SEPA requires the preparation of a detailed environmental impact statement (EIS) if a proposed major action may have a probable significant adverse impact on the environment. An environmental checklist is used by the local agency to determine whether preparation of an EIS will be required. The agency may conclude that the project will not have significant environmental impacts, in which case a determination of nonsignificance (DNS) will be issued; that, as occurred here, the project may have a probable significant adverse impact but can be altered to mitigate the adverse impact, in which case a mitigated DNS, or MDNS, will be issued; or that, in light of a probable adverse impact, an EIS must be prepared.

Rock submitted an application for the permit and other environmental approvals in the form of a joint aquatic resources permit application (JARPA). The JARPA was considered by a hearing examiner, who approved the application in part, subject to revised conditions. In substantially approving the application, the hearing examiner concluded that a permanent 75-foot shoreline setback for the project and compliance with a habitat management plan prepared by Coyote Rock's consulting wildlife biologist would adequately mitigate impacts of the project on key habitat along or near the river. Among conditions imposed by the approval were that the required 75-foot shoreline setback be permanently marked on the ground and that title notices be filed with the county auditor to provide notice of the setback to future owners. The decision also conditioned approval on a requirement that any property owner in the Coyote Rock development wishing to install a dock along the Spokane River meet with the city's community development department, Ecology, and Fish & Wildlife before applying for approval, stating, "The intent of this condition is to reduce the number and impacts of docks along this reach of the shoreline. Only minimal low impact access ways and docks will be approved." CP at 134.

¶5 Two years later, in anticipation of constructing its first dock on the Spokane River adjacent to a spec home it was constructing on lot 23, Coyote Rock obtained further guidance from city planners on the federal, state, and local requirements. Among the requirements identified by the city were its shoreline master program, which required that Coyote Rock apply for a substantial development permit or demonstrate that it was exempt from the permit requirement, and SEPA, compliance with which was initiated by completing an environmental checklist.

¶6 The city's shoreline master program map designates the shoreline area at Coyote Rock and neighboring land located along the south side of the Spokane River as "Pastoral." Within areas designated by the city as Pastoral,

docks are allowed only if statutorily exempt from the shoreline substantial development permitting requirement under RCW 90.58.030(3)(e)(vii). But other provisions of the master program provide that areas within subdivisions or plats that received preliminary approval by December 31, 1974 shall be designated "Rural" (the second least restrictive area classification) notwithstanding their designation on the master program map, unless designated "Urban" (an even less-restrictive classification). A large portion of the Coyote Rock property was originally platted in 1908 and is therefore deemed Rural. The master program permits docks in the Rural area for recreational, educational, or other public purposes, with shared or community docks being preferred over individual docks for the sole use of a property owner.

¶7 The city circulated Coyote Rock's environmental checklist to Fish & Wildlife and Ecology, asking for comments. Fish & Wildlife responded with a request that detailed plans be provided on whatever walkways, staircases, or graveled ramps were planned to provide access from the home to the dock. Ecology submitted no formal comment by the city's requested deadline but later sent an informal communication that piers were prohibited under the city's master program, that joint use docks are preferred, and that at a minimum joint use access should be required to limit impacts.

¶8 Coyote Rock obtained the permits and approvals required to construct the dock, including a letter of exemption from the city excusing it from the requirement to obtain a substantial development permit on the basis that it was currently the owner of the single family residence associated with the proposed dock, whose estimated cost was under $10,000.[4] The letter of exemption reiterated, as

---

[4] Other requirements satisfied by Coyote Rock were the requirement under the state hydraulic code (chapter 77.55 RCW) that it obtain a hydraulic permit approval from Fish & Wildlife, and the city floodplain regulations, which required obtaining a further permit before installing the dock.

a condition of approval, the 75-foot shoreline setback requirement to which Coyote Rock was already subject, requiring that no disturbance in the 75-foot shoreline setback could occur without the approval of the city's planning division, Ecology, and Fish & Wildlife, and that

> [d]etail[ed] plans shall be submitted showing the development in the seventy-five (75) foot wide shoreline setback. This also includes any proposed access from the area of the residence to the dock access.

CP at 10. Plans later filed by Coyote Rock contemplated that a trail may be built from each house to the river.

¶9 Several months after it submitted materials in support of approval for construction of a dock for lot 23, Coyote Rock filed materials in support of approval for construction of a second spec dock adjacent to lot 9. This time, Ecology timely submitted comments in response to the SEPA checklist. It contended that a spec dock is not designed for the private, noncommercial use of the owner, lessee, or contract purchaser of a single or multiple family residence within the meaning of the statutory exemption, stating:

> The application submitted and conversations with the developer and home builder make it perfectly clear that this is a spec home and a spec dock. It has not been purchased for the private use of an owner as of yet.
>
> . . . [U]ntil the residence is purchased, no docks can be constructed along this reach of the river. After the spec home is sold and the new owner decides they would like a dock, application could be made.

CP at 22. Asserting that Coyote Rock had already constructed an "illegal" dock,[5] Ecology elaborated on its concern:

---

[5] Ecology's reference was to the dock adjacent to lot 23. Although Coyote Rock ultimately obtained all the required approvals for that dock, it had installed the dock before obtaining full approval and had violated conditions of approval dealing with the timing, notice requirements, and manner of constructing the dock.

As can be seen by the existing illegal dock, the real impact from docks in this location is in developing access through the shoreline buffer to access the dock. We believe that the intent, goals and use policies of the [shoreline master program] will require limiting access and the destruction to the riparian corridor inherent in developing that access, through the use of joint access and docks. The cumulative effects of locating 30 individual docks and access on this reach of river will result in complete degradation of the shoreline and should be reviewed and quantified prior to any dock authorization.

*Id.*

¶10 Ecology appealed the letter of exemption for the dock adjacent to lot 23 to superior court under the Land Use Petition Act (LUPA), chapter 36.70C RCW.[6] Its petition alleged on information that Coyote Rock intended to install docks on all 30 of the waterfront lots in the subdivision to increase the value of the lots for resale. It asked that the court reverse the exemption and either deny the application or remand the matter to the city with instructions to condition the exemption on requirements addressing cumulative impacts, including a limitation to joint docks or joint access. When the city issued a second letter of exemption for Coyote Rock's construction of a dock adjacent to lot 9, Ecology brought a second LUPA action. The appeals were consolidated.

¶11 The superior court affirmed the city's issuance of the exemptions, finding that the docks in question were "clearly intended for the private, non-commercial use of the adjoining properties" and that the adverse cumulative environmental impact was "speculative and not supported by the record." CP at 747. Ecology brings this appeal.

---

[6] Ecology had no administrative remedy, since standing to appeal the exemption decision under the city's municipal code was limited to property owners or adjacent property owners, and the shorelines hearings board has no jurisdiction to review exemptions. *See Putnam v. Carroll*, 13 Wn. App. 201, 534 P.2d 132 (1975).

## ANALYSIS

*Issues, Standard of Review, and Maxims of Construction*

¶12 The superior court's review of the city's land use decisions in issuing the letters of exemption was pursuant to LUPA and constituted appellate review on the administrative record before the city. RCW 36.70C.120(1). As a party challenging a land use decision, Ecology is required to demonstrate one of the standards for relief provided by statute. RCW 36.70C.130(1). It relies on two statutory standards in challenging the city's letters of exemption: It argues first that the city's decisions in issuing the letters of exemption were an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise. RCW 36.70C.130(1)(b). Specifically, it argues that the exemption from shoreline permitting for residential docks provided by RCW 90.58.030(3)(e)(vii) does not apply to spec docks built for resale. Second, it contends that the decisions were a clearly erroneous application of the law to the facts. RCW 36.70C.130(1)(d). Here, it argues that the policies of the SMA and the city's master program require that the city impose conditions addressing the cumulative impacts that will result from eventual construction of 30 docks, something the city's letters of exemption do not do.

██ ██ ¶13 Whether a decision reflects an erroneous interpretation of the law under standard (b) is a question of law that courts review de novo. *Lauer v. Pierce County*, 173 Wn.2d 242, 252, 267 P.3d 988 (2011). Under standard (d), a decision is clearly erroneous if, " 'although there is evidence to support it, the reviewing court on the record is left with the definite and firm conviction that a mistake has been committed.' " *Id.* at 253 (quoting *Phoenix Dev., Inc. v. City of Woodinville*, 171 Wn.2d 820, 829, 256 P.3d 1150 (2011)).

██ ¶14 On appeal, we stand in the shoes of the superior court and review the decisions for factual or legal error

under the statutory standards based on the record of the city, not that of the superior court. *HJS Dev., Inc. v. Pierce County ex rel. Dep't of Planning & Land Servs.*, 148 Wn.2d 451, 468, 61 P.3d 1141 (2003).

■ ¶15 Our fundamental purpose in construing statutes is to ascertain and carry out the intent of the legislature. We determine the intent of the legislature primarily from the statutory language. In the absence of ambiguity, we will give effect to the plain meaning of the statutory language. *In re Marriage of Schneider*, 173 Wn.2d 353, 363, 268 P.3d 215 (2011). In determining whether a statute conveys a plain meaning, "that meaning is discerned from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002).

¶16 If a statute is " 'susceptible to two or more reasonable interpretations,' " it is ambiguous. *Five Corners Family Farmers v. State*, 173 Wn.2d 296, 305, 268 P.3d 892 (2011) (quoting *Burton v. Lehman*, 153 Wn.2d 416, 423, 103 P.3d 1230 (2005)). The fact that two or more interpretations are conceivable does not render a statute ambiguous. *Id.*

*Construing the Dock Exemption at RCW 90.58.030(3)(e)(vii)*

■ ¶17 In determining the intended scope of exemptions from the substantial development permitting process, we consider the explicit findings enacted as part of the SMA as an aid to construing its provisions. They include findings that "the shorelines of the state are among the most valuable and fragile of its natural resources" and "there is great concern throughout the state relating to their utilization, protection, restoration, and preservation." RCW 90.58.020. They include further findings that "ever increasing pressures of additional uses are being placed on the shorelines necessitating increased coordination in the[ir]

management and development" and that "unrestricted con-
struction on the privately owned or publicly owned shore-
lines of the state is not in the best public interest." *Id.*

¶18 In construing the exemptions it is appropriate,
too, to consider the difference that an exemption makes to
utilization, protection, restoration, and preservation of the
shoreline. A substantial development ordinarily may not be
undertaken on a shoreline without first obtaining a permit
from the local government having administrative jurisdic-
tion under the SMA, RCW 90.58.140(2); "substantial devel-
opment" is generally defined as "any development of which
the total cost or fair market value exceeds five thousand
dollars, or any development which materially interferes
with the normal public use of the water or shorelines of the
state," RCW 90.58.030(3)(e). If a dock is not exempt, it does
not mean that the SMA forbids its construction, it only
means that construction of the dock is subject to the permit
review and approval process.[7]

¶19 The permit application process provides several
steps in an effort to assure the "coordinated planning . . .
necessary in order to protect the public interest associated
with the shorelines of the state while, at the same time,
recognizing and protecting private property rights consis-
tent with the public interest," another stated policy of the
SMA. RCW 90.58.020. Not only must the permit applicant
seeking a shoreline substantial development permit dem-
onstrate that its proposal is consistent with the local
master program and the SMA, but public input into that
determination is provided through (1) public notice of the
application, (2) an opportunity for members of the public to

---

[7] We recognize that our conclusion that Coyote Rock's construction of a spec
dock does not qualify for the owner-noncommercial use exemption will have an
additional ramification under the specific master program at issue here: unless
the city modifies its master program, Coyote Rock will not be able to construct
docks at all on its waterfront lots (if any) that were not platted prior to 1974 and
fall within the area that the master program designates Pastoral. That is not a
direct consequence of our construction of the SMA, however, but a collateral
consequence of the provisions of the particular master program at issue here.

comment and receive notice of a final decision, and (3) the public's opportunity to participate in any hearing held on an application and to appeal the permit decision to the shorelines hearings board before construction may proceed. RCW 90.58.140(4), (7); RCW 90.58.180(1), (2); *Buechel v. Dep't of Ecology*, 125 Wn.2d 196, 205, 884 P.2d 910 (1994).

¶20 For projects recognized as exempt by the local government, there is no public process and no appeal to the shorelines hearings board. The project is still required to comply with the SMA because "[a]n exemption from the substantial development permit process is not an exemption from compliance with the [SMA] or the local master program, nor from any other regulatory requirements." WAC 173-27-040(1)(b). And the land use decision may be challenged under LUPA, as Ecology did here, although it is the challenger that bears the burden of demonstrating that one of the standards for appeal has been met.

■■ ¶21 Exemptions from the substantial development permit process are construed narrowly. Only developments that meet the precise terms of a listed exemption may be granted exemption. WAC 173-27-040(1)(a). And exemptions, as with all statutory provisions, must be interpreted and construed " 'so that all the language used is given effect, with no portion rendered meaningless or superfluous.' " *G-P Gypsum Corp. v. Dep't of Revenue*, 169 Wn.2d 304, 309, 237 P.3d 256 (2010) (internal quotation marks omitted) (quoting *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003)).

■ ¶22 When we construe the owner-noncommercial use exemption narrowly, precisely, and by giving effect to all of its language, we note three of its requirements relevant to our analysis: (1) it is an exemption for construction of the dock; (2) the construction must be for "*the* . . . use" of "*the* owner, lessee, or contract purchaser of single and multiple family residences"; and (3) it must be for such owner's, lessee's, or contract purchaser's private, "noncommercial" use. RCW 90.58.030(3)(e)(vii) (emphasis added).

¶23 Ecology places its principal reliance on a textual argument: that use of the definite article "the" before "owner, lessee, or contract purchaser" rather than the indefinite article "an" requires that we construe the exemption to apply only where the owner, lessee, or contract purchaser who is requesting permission to construct the dock will be its private, noncommercial user.[8] Use of a definite rather than indefinite article is a recognized indication of statutory meaning. *See In re Estate of Garwood*, 109 Wn. App. 811, 816, 38 P.3d 362 (2002) (contrasting use of "an award" versus "the award" in interpreting meaning); *Tewell, Thorp & Findlay, Inc. v. Cont'l Cas. Co.*, 64 Wn. App. 571, 576, 825 P.2d 724 (1992) (meaning of "a" claim is broader than "the" claim). "The rules of grammar . . . provide that the definite article, 'the', is used 'before nouns of which there is only one or which are considered as one.' " *State v. Neher*, 52 Wn. App. 298, 300, 759 P.2d 475 (1988) (quoting A.J. THOMSON & A.V. MARTINET, A PRACTICAL ENGLISH GRAMMAR 3 (3d ed. 1982)), *aff'd*, 112 Wn.2d 347, 771 P.2d 330 (1989).[9] The indefinite article "a" or "an" is used, on the other hand, " 'when the individual in question is undetermined, unidentified, or unspecified.' " *State v. Ose*, 156 Wn.2d 140, 146, 124 P.3d 635 (2005) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1 (2002)).

¶24 Coyote Rock and the city do not directly address Ecology's grammatical argument. But both contrast the dock exemption at subsection (vii) of RCW 90.58.030(3)(e)

---

[8] We do not mean to suggest here or elsewhere in the opinion that a local jurisdiction cannot allow application for the exemption to be made by an agent or attorney-in-fact; only that the exemption may be granted solely for construction of the dock for the private, noncommercial use of an existing, identified owner, lessee, or contract purchaser of a single or multiple family residence.

[9] In *Neher*, both the Court of Appeals and Supreme Court ultimately construed "the proximate cause" as used in the vehicular assault statute in a nonrestrictive manner, although on rationales not applicable here. The Court of Appeals concluded that a restrictive reading of "the" in the vehicular assault statute would lead to an absurd result and rejected what it characterized as a "literal reading" of the statute on that basis. 52 Wn. App. at 300. The Supreme Court held that as used in the vehicular assault statute, "the" modifies "proximate" as opposed to indicating singularity. 112 Wn.2d at 350-51.

with the exemption for construction of single family residences that immediately precedes it at subsection (vi). That subsection exempts

> [c]onstruction on shorelands by an owner, lessee, or contract purchaser of a single family residence for his own use or the use of his or her family, which residence does not exceed a height of thirty-five feet above average grade level and which meets all requirements of the state agency or local government

as contrasted with the dock exemption, which again exempts

> [c]onstruction of a dock, including a community dock, designed for pleasure craft only, for the private noncommercial use of the owner, lessee, or contract purchaser of single and multiple family residences

subject to the $10,000 fair market value limitation. RCW 90.58.030(3)(e)(vi), (vii).

¶25 Coyote Rock and the city argue that the fact that the legislature did not include the limiting language *"for his own use or the use of his or her family"* in exempting docks implies that it intended no such limitation. But an alternative explanation lies in the different structure of the two exemptions. The residence exemption first identifies generally who can rely on the exemption, followed by a qualifier requiring personal use. The dock exemption reverses the order, describing first the required private use and then a definite use-related identification of who can rely. "Construction . . . for *the* . . . use of *the* owner," although structurally different, has a meaning that (for relevant purposes) is parallel to, not different from, "Construction . . . by *an* owner . . . for *his own* use." Both exemptions link construction of the proposed development to an identified owner's or homeowner's qualifying use.

¶26 Our Supreme Court attached significance to this sort of linkage between eligibility for a development exemption and a qualified user in *Campbell & Gwinn*. In that case, it examined whether the developer of a 20-lot residen-

tial development could avoid the requirement to secure a groundwater permit for a water system by applying instead to drill individual wells for each lot, relying on an exemption for single, domestic use wells withdrawing no more than 5,000 gallons a day. The applicable statute forbade withdrawal of public waters or construction of a well without obtaining a permit from Ecology subject to several exceptions, the pertinent one providing:

> "EXCEPT, HOWEVER, That any withdrawal of public ground waters for . . . *single or group domestic uses in an amount not exceeding five thousand gallons a day* . . . is and shall be exempt from the provisions of this section."

146 Wn.2d at 8 (quoting RCW 90.44.050). The court recognized that the developer had elected to seek individual well exemptions because "obtaining new permits to appropriate water within a reasonable time ha[d] become virtually impossible." *Id.* at 18.

¶27 A majority of the court concluded that the eligibility of a developer for the exemption must be tested by its own purpose and use for the water, rather than as a proxy for future home purchasers, because "[t]he developer of a subdivision is, necessarily, planning for adequate water for group uses, rather than a single use." *Id.* at 12. It reasoned that the two concepts of constructing a well and withdrawing water must be "linked" for purposes of the exemption, explaining:

> The same two concepts must be linked for purposes of the exemption from the permitting process because that is precisely what the exemption is—an exemption excusing the applicant from permit requirements. The one seeking an exemption from permit requirements is necessarily the one planning the construction of wells or other works necessary for withdrawal of water and is the one who would otherwise have to have a permit before any construction commences or wells are dug.

*Id.* at 13. It concluded that "[t]he developer may not claim multiple exemptions for the homeowners." *Id.* at 14.

¶28 The *Campbell & Gwinn* majority also recognized that whether it construed the exemption as available only to individual homeowners or as available to developers made a difference that should be examined in light of policies and legislative intent. It observed:

> [U]se of the exemption by developers will predictably and greatly expand unpermitted water use in this state. Individual, single family residential use of the exemption (or group uses not exceeding 5,000 [gallons per day] in total) is simply not comparable to what can occur if the exemption is rewritten to allow for multiple wells in large developments.

*Id.* at 14 n.4. Whether a risk of increased water use was real and mattered was a point of disagreement for several members of the court; two dissenting opinions suggested that since any homeowner would need to drill a well for its domestic use and Ecology had authority to monitor the amount of withdrawals, the risk of increased cumulative impact was imagined unless the court's objective was to deter residential development altogether. *See id.* at 23-28 (Owens, J., dissenting), *id.* at 21-23 (Sanders, J., concurring in dissent).

¶29 In this case, by contrast, developer eligibility for the exemption presents an undeniable potential for increased impacts of the sort that concerned the *Campbell & Gwinn* majority. No future homeowner in Coyote Rock needs his or her own individual dock. Many may not want one or choose not to build one. We agree with the observation of Ecology that

> spec docks by their very nature are constructed without knowledge of the specific needs or desires of the future homeowner. Inevitably, some homeowners will decide they do not want the dock, or they will want a different size or type of dock to better fit their needs. The construction of spec docks built for resale necessarily entails incurring environmental harm without, at least in some cases, any corresponding benefit to the homeowner.

Br. of Appellant at 17.

¶30 *Campbell & Gwinn* does not hold, and we do not suggest, that whenever a statute regulates development because of legislative concern with cumulative impacts then no residence- or homeowner-based exemption may be relied upon by a developer. Whether a developer may rely on an exemption will turn in each case on the language of the statute and the exemption. But allowing a developer to rely on a residence- or homeowner-based exemption as the proxy for hoped-for future home purchasers may predictably expand impacts, as recognized in *Campbell & Gwinn*, and thereby conflict with policies and concerns of the legislation. Accordingly, where, as here, the plain language of the exemption ties it to construction for the private use of the owner, we will not construe the exemption as available for speculative construction.[10]

¶31 Coyote Rock finally argues, correctly, that the dock exemption does not distinguish between types of owners, lessees, or contract purchasers who are eligible for the exemption. It was therefore entitled to seek exemption in its own right, even if not as a proxy for future homeowners. But as previously observed, eligibility for the exemption depends on construction of the dock for a private, "noncommercial" use. "Noncommercial" is not defined by the SMA. Its ordinary meaning is "not commercial," as in "not used in commerce," "having no commercial importance," or "not commercially motivated." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1536 (1993). If the construction of docks for lots 23 and 9 can be said to have been designed for Coyote Rock's "use" at all, then it was for resale, a clearly commercial use.

---

[10] Coyote Rock legitimately distinguishes this case from one rationale relied upon by the majority in *Campbell & Gwinn*: that the exemption for water permitting was available for limited withdrawal for single or group domestic uses, and the developer's eligibility would be evaluated as a group use. 146 Wn.2d at 12. That rationale has no application here. But it does not detract from the majority's other rationales for its decision, which do apply.

¶32 Because Coyote Rock was not eligible for the exemption relied upon by the city, the superior court's order denying Ecology's land use petitions must be reversed.

¶33 Given our disposition of the issue of statutory construction, it is not helpful for us to reach Ecology's second argument. Should some form of its argument be raised in proceedings following remand, it will be on a different record, subject to different burdens and arguably subject to legal authority that did not apply to the city's decision on the exemption issue.

¶34 We reverse and remand to the superior court with directions that it reverse the exemptions issued by the city.

KORSMO, C.J., and KULIK, J., concur.

Review denied at 175 Wn.2d 1015 (2012).