IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| HOLLYWOOD HILL NEIGHBORS, | No. 83790-7-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| KING COUNTY, MURRAY FRANKLYN HOMES LLC, | |
| Respondents. | |

DíAZ, J. — A group of residents referring to themselves as the Hollywood Hills Neighbors ("Neighbors") brings a Land Use Petition Act ("LUPA") action, challenging King County's approval of a boundary line adjustment ("BLA") application for eight property lots submitted by Murray Franklyn Homes LLC ("Murray Franklyn" or "the owner"). Here on direct review, the Neighbors argue, in part, that the County violated King County Code ("KCC") 19A.28.020 in approving the BLA application because the resulting lots were too small to qualify as "building sites" under current law. A plain reading of this ordinance, in the context of the entire statutory scheme, compels us to agree. Thus, we reverse the County's approval of Murray Franklyn's BLA application and grant the LUPA petition.

I.    FACTS

James and Maxine Keesling originally owned the property that comprises the eight King County lots (the "Keesling lots") at issue in this appeal, among other adjoining

Citations and pin cites are based on the Westlaw online version of the cited material.

property. Pursuant to the Keesling's divorce decree in 1974, and supplementary judgment in 1985, the lots were created and divided between them. In 1999, the County issued a letter, recognizing the Keesling lots as separate legally created lots and exempt from meeting the short subdivision requirements, but also noting that:

> Recognition of the property as a separate lot is not to be regarded as a commitment [by the County] that the lots in their present state are suitable for development . . . Any application for development approval will be reviewed under the ordinances and laws in effect at that time.

Murray Franklyn later purchased the Keesling lots.[1]

In February 2021, Murray Franklyn submitted a BLA application to the County to reconfigure the property lines between the Keesling lots and one additional lot. In early November 2021, the County approved the owner's BLA application, which was recorded as BLAD21-0005 in January 2022. The final BLA included eight lots,[2] ranging in area from 36,623 square feet to 50,082 square feet. The BLA did not change the square footage of any of the lots. The lot boundaries, which were vertical, were approved to be modified to be more or less horizontal.

In late November 2021, the Neighbors filed the instant LUPA action challenging the County's approval of the BLA.[3] In the Neighbors's petition, they claim their quality of life would be negatively impacted by the Keesling lots's development, including "more traffic, more noise, worse views, less available on-street parking, and less wildlife habitat."

---

[1] As it is not relevant to the issues in this appeal, we do not discuss in greater detail the somewhat complex history of these lots. Though the Neighbors suggest that the legal origins of the lots might be relevant to the lawfulness of the BLA, they concede that the County's 1999 letter recognized the Keesling lots as "lawfully created."

[2] At some point, the owner deleted one of the nine lots from the BLA application.

[3] The Neighbors also challenged a second BLA, BLAD21-0006, but the owner rescinded that BLA from the County's consideration and it is not at issue in this appeal.

The Neighbors argue, in part, that the County's approval violated KCC 19A.28.020.D2 because the resulting Keesling lots were too small to qualify as "building sites" pursuant to KCC 19A.04.060. The Neighbors also argued that the BLA violated other County codes by unlawfully "creating" additional lots and attempting to circumvent the subdivision statute.[4]

In February 2022, the parties stipulated to direct appellate review of the Neighbors's LUPA action pursuant to RCW 36.70C.150[5] and RAP 6.4,[6] and the superior court transferred the matter to this court in March 2022.

## II.    ANALYSIS

### A. Standing

Respondent King County does not challenge the Neighbors's standing. Murray Franklyn, however, argues that the Neighbors do not meet the requirements of RCW 36.70C.060(2), which addresses standing to bring a land use petition.[7] Specifically,

---

[4] The Neighbors also claimed that the two BLAs were unlawfully approved without environmental review pursuant to the State Environmental Policy Act (SEPA). These arguments are not at issue in this appeal.

[5] RCW 36.70C.150 provides in part: "The superior court may transfer the judicial review of a land use decision to the court of appeals upon finding that all parties have consented to the transfer to the court of appeals and agreed that the judicial review can occur based upon an existing record."

[6] RAP 6.4 states: "The appellate court accepts direct review of a Land Use Petition Act proceeding according to the procedures set forth in chapter 36.70C RCW. A case that has been certified for review by the superior court is treated as a direct appeal."

[7] Murray Franklyn may have waived any standing defense by not raising this issue before the superior court as facially required by RCW 36.70C.080(3). However, the Neighbors did not note an initial hearing, as also facially required by that statute. In their initial briefing before this court, neither party raised or briefed this procedural concern nor did they brief how those requirements interrelate with the transfer provision in LUPA. As such we will not reach that issue, nor ascribe any significant legal effect or culpability to those unfollowed procedural decisions, as the dissent does. RAP 12.1. Instead we will address the substantive requirements of RCW 36.70C.060(2), as the parties briefed.

Murray Franklyn asserts that the Neighbors do not satisfy the requirements of RCW 36.70C.060(2)(a) and (b).[8] We disagree.

RCW 36.70C.060(2)(a) and (b) provide that standing to bring a LUPA petition is limited to persons who are:

> [A]ggrieved or adversely affected by the land use decision, or who would be aggrieved or adversely affected by a reversal or modification of the land use decision. A person is aggrieved or adversely affected within the meaning of this section only when all of the following conditions are present:
>
> (a) The land use decision has prejudiced or is likely to prejudice that person;
>
> (b) That person's asserted interests are among those that the local jurisdiction was required to consider when it made the land use decision . . . .

To satisfy RCW 36.70C.060(2)(a), the "prejudice prong," a party must demonstrate an "injury-in-fact," and, where the injury is threatened rather than existing, the party must also show that the injury will be "immediate, concrete, and specific." Knight v. City of Yelm, 173 Wn.2d 325, 341, 267 P.3d 973 (2011) (quoting Chelan County v. Nykreim, 146 Wn.2d 904, 934-35, 52 P.3d 1 (2002)) and Suquamish Indian Tribe v. Kitsap County, 92 Wn. App. 816, 829, 965 P.2d 636 (1998)). While we have held that a claimant may not have standing where they claim only an "abstract" interest in having others comply with the law, our Supreme Court has held that nearby property owners may have LUPA standing if they can demonstrate that they or their property would be "affected" by such a development. Knight, 173 Wn.2d at 342 (quoting Nykreim, 146 Wn.2d at 934; Suquamish, 92 Wn. App. at 831). This court has held that even seemingly minor injuries—such as the prospect of increased local traffic "passing by [a] house"—can be

---

[8] Murray Franklyn does not challenge the Neighbors's standing on the basis of RCW 36.70C.060(2)(c) or (d), so we do not address those here.

sufficient to establish an injury. Suquamish, 92 Wn. App. at 831. Finally, we and our Supreme Court have been clear that "a party not need show a *particular* level of injury in order to establish standing." Id. at 832 (citation omitted) (emphasis added); Nykreim, 146 Wn.2d at 935 (quoting Skamania County v. Columbia River Gorge Comm'n, 144 Wn.2d 30, 26 P.3d 241 (2001)).

Murray Franklyn's first argument regarding RCW 36.70C.060(2)(a) is that there is no evidence in the record that any of the Neighbors owns property "adjacent to the subject Lots," as the only named petitioner lives "two blocks away." The LUPA petition, indeed, notes that the Hollywood Hill Neighbors reside in the "immediate vicinity" of the Keesling lots. In their supplemental briefing, the Neighbors, however, provided a declaration from Neighbors member, Eric Greenwood, that attests that he lives "within 416 feet of the Keesling lots," and identifies other members of the association that have properties that are near or even abut the Keesling lots.[9]

Regardless of the precise location of the Neighbors's properties, there is no

---

[9] The dissent makes much of the fact that the Neighbors filed Greenwood's declaration for the first time only as part of this appeal. Dissent 3-6. Tellingly, Murray Franklyn (a) brought no motion, under RAP 17 or otherwise, to strike that declaration (although it knew how, as it made objections to other unrelated attempts to supplement the record), or (b) even raised the declaration as a procedural concern at oral argument. Furthermore, neither party briefed this issue. Because generally we should "decide a case only on the basis of issues set forth by the parties in their briefs," the majority is disinclined to reach this issue. RAP 12.1; State v. Elliott, 114 Wn.2d 6, 15, 785 P.2d 440 (1990) ("This court will not consider claims insufficiently argued by the parties.").

More substantively, the declaration here seeks to rebut a claim made, also for the first time *by Murray Franklyn* in its response brief, about a minor fact, which as will be explained above has no legal import: the distance from the Neighbors to the Keesling lots. Otherwise, as the dissent states, the declaration merely "repeats the concern[s]" in the LUPA petition. Dissent at 10. And there is no argument, or case law the majority is aware of, that holds that we may not consider the facts laid out in the petition.

requirement that a property owner must live *directly* next door to the contested property to have LUPA standing. Knight, 173 Wn.2d at 342 (a claimant 1,300 feet away from a proposed subdivision had standing); Suquamish, 92 Wn. App. at 831 (a person 150 feet from the project had standing). Thus, this argument fails.

Murray Franklyn further appears to argue that the Neighbors do not allege sufficiently specific injuries adversely affecting them aside from an "abstract" interest in preserving the zoning of the area.

First, this is factually incorrect as the Neighbors's petition alleges several specific, threatened injuries to their "health, safety and comfort": more traffic, more noise, worse views, less parking, and less wildlife habitat. Biermann v. City of Spokane, 90 Wn. App. 816, 820, 960 P.2d 434 (1998) (finding standing to complain about the absence of a valid building permit and a code violation involving a parking garage on this basis). This type of interest and level of detail is different than some ideological objection to development of any kind or than an "abstract interest of the general public in having others comply with the law." Id. (quoting In re Marriage of T., 68 Wn. App. 329, 335, 842 P.2d 1010 (1993)).[10]

Second, and importantly, Murray Franklyn fails to challenge substantively the nature, factual allegations underlying, or extent of the Neighbors's threatened injuries (whether contained in the petition or supplemental declaration) or explain why they are

---

[10] The dissent would require the Neighbors to have brought "information" about "current traffic patterns," "the number of cars currently utilizing on-street parking, and "the current presence of wildlife," among other quite detailed data. Dissent at 8. In support, it cites to cases that were not brought before us on direct review, where the record was naturally more developed. Id. at 8-9. More importantly, none of the cases cited by the dissent holds that this level of factual support is *required* in a case on direct review. Further, while it is surely not the dissent's intent, the majority declines to close the courthouse doors to future neighbors who may not have the means to conduct sophisticated traffic, wildlife, and other studies before bringing suit.

insufficient to merit standing. We will neither create a fact issue where none is supported by the record nor, for the first time, require the Neighbors to show a particular level of injury to establish standing. Elliott, 114 Wn.2d at 15 ("This court will not consider claims insufficiently argued by the parties."); Nykreim, 146 Wn.2d at 935 (no particular level of injury needed). Thus, we conclude that the Neighbors's petition satisfies the prejudice prong for standing.[11]

As to RCW 36.70C.060(2)(b), the "zone of interest" test, the question for this court is whether the governing body that issued the statute or regulation intended the agency to protect the party's interest when taking the action at issue.[12] Nykreim, 146 Wn.2d at 937 (quoting Seattle Bldg. & Constr. Trades Council v. Apprenticeship & Training Council, 129 Wn.2d 787, 797, 920 P.2d 581 (1996)). Notably, "'although the zone of interest test serves as an additional filter limiting the group which can obtain judicial review of an agency decision, the 'test is not meet to be especially demanding.'" Nykreim, 146 Wn.2d

---

[11] Murray Franklyn further contends, and the dissent agrees, that the Neighbors do not have standing because the BLA technically does not authorize construction on the Keesling lots and, thus, there is no immediate impact to the surrounding properties. In other words, the owner argues that no prejudice comes from the mere redrawing of lines unless and until there is actual authorization to develop the lots, which the BLA does not do. While Murray Franklyn is correct that the BLA does not immediately authorize construction on these lots, RCW 36.70C.060(2)(a) does not limit standing to actual prejudice but includes actions that are "likely to prejudice" a party. Here, there is no claim that the redrawing of lines is merely a cartological exercise. As counsel for Murray Franklyn noted at oral argument, these lots are presently in the process of now being developed based on the BLA and, thus, the Neighbors's threatened injuries are sufficiently "likely" to create standing. Wash. Ct. of Appeals oral argument, Hollywood Hill Neighbors v King County et al., No. 83790-7-I (Nov. 3, 2022), at 8 min., 38 sec., video *recording by TVW*, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2022111119/?eventID=2022111119.

[12] The cited case refers to actions of the state Legislature, but here the issue relates to the actions of the County, who is the "governing body" over its agency, the King County Department of Local Services, Permitting Division.

at 937 (quoting Seattle Bldg. & Constr. Trades Council, 129 Wn.2d at 797).

Murray Franklyn suggests that, because the County's BLA procedures are non-appealable and do not require community meetings or public notice and comment, the County was not required and did not intend for its agency to consider the Neighbors's interest when it made its BLA decision. We disagree.

As will be discussed in more detail below, the Neighbors bring their LUPA action to prevent the County from violating, inter alia, KCC 19A, which governs the size of building sites. The County's stated purpose of KCC 19A was to "insure consistency with chapter 58.17 RCW." KCC 19A.01.010. In Chapter 58.17 RCW, the Washington State Legislatures provides that:

> [T]he process by which land is *divided* is a matter of state concern and should be administered in a uniform manner by cities, towns, and counties throughout the state. The purpose of this chapter is to regulate the subdivision of land and to promote the *public health*, safety and general welfare in accordance with standards established by the state to prevent the overcrowding of land; to lessen *congestion* in the streets and highways; to promote effective use of land; to promote safe and *convenient travel* by the public on streets and highways; to provide for adequate light and air; . . . to provide for the expeditious review and approval of proposed subdivisions which *conform to zoning standards and local plans and policies*; . . . .

RCW 58.17.010 (emphasis added).

In other words, one of the County's regulatory interests is to be consistent with the foregoing directive from the State Legislature, namely, to ensure its process in "dividing" land avoids the type of potential harm the Neighbors claim herein: worse traffic congestion or inconvenient travel, unsafe noise, and the improvement of the general welfare arising from seeking to preserve a rural environment by avoiding wrongful applications of County code provisions.

8

The Neighbors, thus, satisfy RCW 36.70C.060(2)(b)'s "not . . . especially demanding" standing requirements and, thus, both prongs of the relevant test. Nykreim, 146 Wn.2d at 937.

### B. The County's Approval of Murray Franklyn's BLA Violated KCC 19A.28.020.D.2

When we review a LUPA petition on direct review pursuant to RCW 36.70C.150 we "stand in the shoes of the superior court." Mason v. King County, 134 Wn. App. 806, 809, 142 P.3d 637 (2006) (citing Citizens to Preserve Pioneer Park, L.L.C. v. City of Mercer Island, 106 Wn. App. 461, 470, 24 P.3d 1079 (2001)). A party may be entitled to relief from a land use decision if they can demonstrate that the decision is an "erroneous interpretation of law." RCW 36.70C.130(1)(b).[13] We review questions of law de novo. Mason, 134 Wn. App. at 810.

Where we engage in statutory interpretation, we attempt to determine legislative intent from the plain language of the text. Whatcom County v. Hirst, 186 Wn.2d 648, 667, 381 P.3d 1 (2016). We consider the provision, related provisions, and the statutory scheme as a whole. Id. "'If the language of a statute is clear on its face, courts must give effect to its plain meaning and should assume the Legislature means exactly what it says." Nykreim, 146 Wn.2d at 926. Additionally, all language in a statute should be given effect so no portion is rendered superfluous. Manna Funding, LLC v. Kittitas County, 173 Wn.

---

[13] In addition to RCW 36.70C.130(1)(b) ("erroneous interpretation of the law") as a statutory basis for reversing the County's BLA decision, the Neighbors cite as alternatives RCW 36.70C.130(1)(c) (the land use decision is not supported by substantial evidence) and RCW 36.70C.130(1)(d) (the land use decision was a "clearly erroneous application of the law to the facts"). As this case asks us to interpret the meaning of the County code provisions at KCC 19A.28.020, RCW 36.70C.130(1)(b) is most applicable here and, for the reasons further explained below, we need not reach the other bases.

App. 879, 890, 295 P.3d 1197 (2013). These principles of statutory interpretation apply to local legislation. Griffin v. Thurston County, 165 Wn.2d 50, 55, 196 P.3d 141 (2008).

The Neighbors contend that the County's approval of Murray Franklyn's BLA was an erroneous interpretation of and, thus, violated KCC 19A.28.020.D.2. Specifically, the Neighbors claim that the County misinterpreted the limitations of the BLA procedure and the term "building sites," when it approved the BLA application for the Keesling lots. The Neighbors argue that, according to the correct understanding of the County's code provisions, the resulting lots do not qualify as "building sites" and, thus, the lots may not be redrawn via a BLA. We agree.

KCC 19A.28.020 enumerates the "limitations of the boundary line adjustment process." It states that, among other things, BLAs "shall not . . . *result* in a lot that does not qualify as a *building site* pursuant to this title." KCC 19A.28.020.D.2 (emphasis added). We interpret "result," which is not defined in the ordinance, here to mean to "arise as a consequence, effect, or conclusion." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/result (last visited Nov. 18, 2022). This provision is consistent with one purpose of the overall statutory scheme, which is to "provide procedures . . . in order to . . . allow the enlargement or merging of lots to improve or qualify as a building site." KCC 19A.28.010.

The County defines a "building site" as:

> [A]n area of land, consisting of one or more lots or portions of lots, that is:
>
> A. Capable of being developed under *current* federal, state, and local statutes, including zoning and use provisions, dimensional standards, *minimum lot area, minimum lot area for construction*, minimum lot width, shoreline master program provisions, critical area provisions *and* health and safety provisions; or . . .

10

C.  Currently legally developed.[14]

KCC 19A.04.060 (emphasis added).  The County defines "minimum lot area" as based upon the zoning of each property.  KCC 21A.12.030.A.  Because the Keesling lots are zoned as rural areas in designated zone "RA 2.5," the County defines the minimum lot area for these lots as 1.875 acres.  KCC 21A.12.030.A.

These code provisions, taken together, establish that, in the RA 2.5 zone, the BLA procedure is explicitly unavailable where a "resulting" lot—a lot established as a "consequence" of the BLA—would be smaller than 1.875 acres.  After the application of the BLA, all eight of the Keesling lots are smaller than 1.875 acres, the largest of them only measuring 50,082 square feet.[15]  Thus, the County's BLA procedure was simply unavailable to Murray Franklyn for these lots.[16]  We hold that the foregoing is the most direct reading of a relatively straightforward statutory scheme.

Murray Franklyn and the County make four arguments in response. First, Murray Franklyn contends that the County properly approved their BLA under the exemption in RCW 58.17.040(6).  We disagree.

RCW 58.17.040(6) provides that

A division made for the purpose of alteration by adjusting boundary lines, between platted or unplatted lots or both, which does not *create* any *additional* lot, tract, parcel, site, or division *nor create* any lot, tract, parcel, site, or division which contains insufficient area and dimension to meet minimum requirements for width and area for a *building site*[.]

---

[14] As neither party claims that the Keesling lots are "currently legally developed," we focus on the plain language in KCC 19A.04.060.A.

[15] 1.875 acres is the equivalent of 81,675 square feet.

[16] As the narrow question we answer here pertains solely to whether the County properly interpreted KCC 19A.28.020.D.2 and its related code provisions in this instance, we do not opine on whether Murray Franklyn had or has other procedural mechanisms available to it to establish the Keesling lots as building sites.

(Emphasis added.) This is a red herring. The issue is not the "creation" of an additional lot, as all parties agree that numerically no additional lots were "created." The rub here is that, even if no additional lots were generated, the BLA "resulted" in different new potential "building sites," which this statute does not address. Further, Murray Franklyn ignores the term "building sites," which reappears (but is not defined) in RCW 58.17.040(6), and ignores RCW 58.17.033(1), which mandates that "a proposed division of land . . . shall be considered under the . . . ordinances, in effect on the land at the time a fully completed application . . . has been submitted." Thus, the statute in fact incorporates by reference the same prohibition contained in KCC 19A.28.020 and 19A.04.060, and the statute's exemption, again, may not be applied where the resulting lot does not meet the *current* minimum lot area.

This court's decision in Mason is instructive in this regard. Mason, 134 Wn. App. at 809. There, the property owner had two undersized lots and sought a BLA to make one lot conform to the appropriate size, while leaving the other still undersized (and even more so). Id. The county approved the BLA, interpreting "RCW 58.17.040(6) to mean that '[l]ots adjusted through the boundary line procedure are not required to comply with a local jurisdiction's minimum lot size requirements.'" Id. at 811 (quoting King County's brief at 5). A neighbor filed a LUPA petition challenging the resulting undersized lot, which the trial court dismissed. Id. at 809.

This court reversed, holding that no "authority . . . construes chapter 58.17 RCW as allowing a BLA to *transform* a legally created lot into a substandard, undersized lot. Id. at 812 (emphasis added). "To the contrary, . . . the county *must look to its applicable minimum lot size requirements* when determining whether a new lot following a BLA

12

qualifies as a 'building site' pursuant to RCW 58.17.040(6)." Id. (emphasis added). Importantly, RCW 58.17.040(6) does not define the term "building site" and, thus, the "local governments are free to define" themselves "so long as that definition is consistent with applicable local zoning requirements." Id.

Murray Franklyn's argument that the owner there modified the property, by shrinking it further, is a distinction without a difference. Br. of Resp't at 21. The point is that, pursuant to the code, King County must apply the definition of "building site" in its code when a BLA "results in" or "transforms" a preexisting lot. Doing otherwise would "obviate the broader constraints of the zoning regulations" and "might require the county to approve future BLAs, which are adjudicated without public notice, whereby land owners could avoid the formal short plat and subdivision processes otherwise required under the county code." Mason, 134 Wn. App. at 813.

Second, Murray Franklyn and the County argue that KCC 21A.12.030—establishing the minimum lot area in RA 2.5 zone as 1.875 acres—applies only to the "creation of new lots in these areas" but "does not purport to address the requirements for development or construction on *existing* lots." Implicit in this argument is that the Keesling lots are somehow exempt or excused from compliance with KCC 19A.28.020 and 19A.04.060. Neither Murray Franklyn nor the County cites to anything in the text of KCC 21A.12.030, however, that suggests it only applies to the "creation of new lots." They, instead, point to a separate code provision, KCC 21A.12.100.B.1 -- the "minimum lot area for construction" provision – and posits that it is the applicable code for "existing lots."

That provision merely defines "minimum lot area for construction" in the RA 2.5

13

zone as 5,000 square feet.  KCC 21A.12.100.B.1.  But, here again, nothing in that section of the code also suggests that "minimum lot area" and "minimum lot area for construction" apply to different lots based on whether the lots are "new" or "existing."  It is a tortured, non-textual reading to find that distinction in either KCC 21A.12.030 or KCC 21A.12.100.B.1.

Stated more positively, we need not go further than the plain meaning of KCC 19A.04.060, which defines "building site" to include *both* minimum lot area "*and*" minimum area of construction, when determining whether a lot was "capable of being developed" according to current local statutes.  The "and" in this list evidences the County's intent that, to develop an area of land, an owner must meet all current standards in the County's list, unless it is already developed.  In short, in the RA 2.5 zone, a building site must meet both the 1.875-acre zoning requirement and the 5,000 square feet construction requirement.  The County's interpretation creates a distinction not present in the statute and is therefore an error of law.  Handwaving to "statutory interpretation" or "legislative intent" is insufficient to establish some sort of vested, pre-excused, or fundamental property right implicit in or applicable to the ordinance.[17]

Third, Murray Franklyn and the County argue that this interpretation of KCC 21A.12.030 and KCC 21A.12.100.B.1 is problematic because the 5,000 square feet

---

[17] Murray Franklyn also allots a significant section of its briefing arguing that various policies of the King County Comprehensive Plan support its contention that development may occur on nonconforming lots and providing the court with examples of existing lots and lists of building permits issued for various parcels less than 1.875 acres. Murray Franklyn concedes these considerations are not part of the record.  Further, because the statute is clear, we need not look to extraneous materials. See Kilian v. Atkinson, 147 Wn.2d 16, 20, 50 P.3d 638 (2002) ("If a statute is clear on its face, its meaning is to be derived from the language of the statute alone.")

construction requirement would be rendered superfluous due to the 1.875-acre zoning requirement. We disagree: while the 5,000 square feet "minimum lot area for construction" would be unnecessary in zones like RA 2.5, where a minimum lot area is required to be no smaller than 1.875 acres, in other, more dense residential zones in the County, a minimum lot size may be much smaller than the 5,000 square feet required for construction. KCC 21A.12.030 (defining no minimum lot area for residential zones and defining minimum lot widths as 30 feet). Thus, in a different context, the minimum lot area for construction provision is not superfluous. Again, we must consider the statutory scheme as a whole. Hirst, 186 Wn.2d at 667.

Fourth, the County argues that, if the minimum lot area in KCC 21A.12.030 conflicts with the minimum lot area for construction in KCC 21A.12.100, the latter (.100) should govern because it is the more specific provision. Brown v. City of Seattle, 117 Wn. App. 781, 791-92, 72 P.3d 764 (2003) (where there are both general and specific provisions that arguably apply, the specific provision prevails). This argument creates a conflict where none exists. As discussed, we conclude there is no conflict between KCC 21A.12.030 and KCC 21A.12.100 as both operate simultaneously and harmoniously, at times in different spheres.

C. Additional Issues

The Neighbors make additional claims that the County's approval of Murray Franklyn's BLA violated two other provisions of the County's code: KCC

19A.28.020.D.1[18] and KCC 19A.28.020.D7.[19]  As a result of our decision to reverse the County's approval of Murray Franklyn's BLA on the basis that the County violated KCC 19A.28.020.D.2, we need not reach these additional claims.

## III.    CONCLUSION

We reverse the County's approval of Murray Franklyn's BLA and remand to the trial court with instructions to grant the Neighbors's LUPA petition consistent with this opinion.

Díaz, J.

I CONCUR:

Smith, C.J.

---

[18] KCC 19A.28.020.D.1 provides that a BLA cannot be used where it would "[r]esult in the creation of an additional lot or in the creation of more than one additional building site."

[19] KCC 19A.28.020.D7 prevents a BLA from being used to "[c]ircumvent the subdivision or short subdivision procedures set forth in this title."

COBURN, J. (dissenting) - I respectfully dissent from the majority's holding that the Neighbors established standing to bring their petition under RCW 36.70C.060(2)(a). It is improper to consider the Hollywood Hills Neighbors' declaration submitted with its reply brief because we only accept review under RAP 6.4 and RCW 36.70C.150(1) if the parties stipulate to review based upon an existing record, as the parties did here. Because the Neighbors do not have standing, I would dismiss the petition and not reach the merits.

<u>Facts and Procedural History</u>

The parties do not dispute that the eight lots at issue were legally created following a divorce decree in 1974 and eventually distributed to beneficiaries through probate in 1998.

In 1993, King County adopted a new zoning code, adding Title 21A to the King County Code. King County Ordinance 10870 (Apr. 28, 1993). This title created standards for the "densities and dimensions" for use in developing land in King County. <u>Id.</u> § 340. While this included a chart of those requirements similar to the currently enacted KCC 21A.12.030(A), it did not include any requirement for minimum lot area, as the title does today. <u>See</u> <u>Id.</u> Title 21A contained no minimum lot requirement until 2001, more than 25 years after the lots were created in the Keesling's divorce decree. <u>Compare</u> King County Ordinance 13881 (June 27, 2000) (listing densities and dimensions in residential zones) <u>with</u> King County Ordinance 14045 § 18 (Feb. 21, 2001) (adding "minimum lot area to the rural area zone").

It was only then, in 2001, that the county began to require newly created lots in the relevant RA 2.5 zone to have a minimum lot area of 1.875 acres. <u>Id.</u> When the new

1

minimum lot sizes were adopted, the legally-created eight lots were far smaller than the 1.875 acres.[1]

In January 2021, the property owners, Keesling Hollywood Hill Management operating under Agent Holly Towle, a beneficiary of James Keesling's will, was in the process of selling to the new owners Murray Franklyn Homes. Prior to closing of the sale, Murray Franklyn applied for a boundary line adjustment (BLA) for the eight lots.[2] The proposal adjusted internal boundaries as between pairs of adjacent lots such that it changed their orientation but did not change the size of the lot.

In September, the Hollywood Hill Neighbors requested a code interpretation of KCC 19A.28.020 related to the then-pending decisions of the BLA on the Keesling lots. The King County Permitting Division issued a final code interpretation as to the Keesling lots stating that it was "premature to challenge the pending applications consistency with K.C.C 19A.28.020." The Division explained that the BLA application did "not seek to create new lots" and that the "buildability" of the lots following any adjustment "will be reviewed through the ongoing permit review process."

The Division ultimately approved the BLA. The approval included a notation that the request "qualifies for exemption under KCC 19A.28"[3] and that the approval does not guarantee that the lots will be suitable for development now or in the future.

---

[1] The eight lots ranged from between 50,043 square feet to 36,623 square feet, less than the roughly 82,000 square feet in 1.875 acres.

[2] As noted by the majority at 2, n.2, the initial application was for BLAs to nine parcels and one was subsequently removed from the application, leaving the eight lots at issue in this appeal.

[3] Nothing in the record clarifies this notation and KCC 19A.28, the section addressing boundary line adjustments, does not include the term "exemption."

On November 29, 2021 the Neighbors intervened by appealing the decision[4] to the King County Superior Court under the Land Use Petition Act (LUPA), chapter 36.70C RCW, contending that the BLA failed to create lots in compliance with KCC 19A.28.020.D.2.  No answer was filed, which is consistent with RCW 36.70C.080(6), which does not require an opposing party in a LUPA to file an answer.

On February 3, 2022, the parties filed a stipulated motion and proposed order to supplement the record with two identified documents, not including Greenwood's declaration, on appeal.  On February 18, the parties filed a stipulation to transfer review to this court under RAP 6.4 indicating that they consented to the transfer and agreed that "the judicial review of this case may be conducted based upon the existing record." The superior court granted the request and certified the matter for review and transfer to this court pursuant to the parties' February 18 stipulation.  No hearing was ever held below.

Record on Review

Because the Neighbors improperly submitted a declaration with its reply brief that is considered by the majority, I take this opportunity to address the new procedure by which the parties sought review.  The Neighbors contend that "because of the unusual posture of this case involving no administrative appeal at the county level and no superior court review, the record on standing is being created in" the court of appeals.

However, RAP 6.4 states that "appellate court accepts direct review of a Land Use Petition Act proceeding *according to the procedures set forth in chapter 36.70C RCW.*" (emphasis added).

---

[4] The King County Code does not authorize an administrative appeal of a BLA decision by a director to a hearing examiner.  KCC 20.20.020.E.

In 2021, the legislature amended chapter 36.70C RCW which governs judicial review of land use decisions. LAWS OF 2021, ch. 305, § 1. The newly adopted RCW 36.70C.150 provides in relevant part:

> (1) The superior court may transfer the judicial review of a land use decision to the court of appeals upon finding that all parties have consented to the transfer to the court of appeals and agreed that the judicial review can occur based upon an existing record. Transfer of cases pursuant to this section does not require the filing of a motion for discretionary review with the court of appeals.
>
> (2) Upon stipulation and consent to transfer, the parties waive the right to seek an award of attorneys' fees and costs under RCW 4.84.370, except as may be awarded following an appeal to the supreme court.

Allowing for transfer of a LUPA to this court as a direct review "based upon an existing record," is not an open invitation to improperly supplement the record.

Nothing in RCW 36.70C.150 or RAP 6.4 eliminates other applicable procedures in ch. 36.70C RCW designed to address preliminary issues. Notably, RCW 36.70C.080 provides

> (1) Within seven days after the petition is served on the parties identified in RCW 36.70C.040(2), the petitioner shall note, according to the local rules of superior court, an initial hearing on jurisdictional and preliminary matters. This initial hearing shall be set no sooner than thirty-five days and no later than fifty days after the petition is served on the parties identified in RCW 36.70C.040(2).
>
> (2) The parties shall note all motions on jurisdictional and procedural issues for resolution at the initial hearing, except that a motion to allow discovery may be brought sooner. Where confirmation of motions is required, each party shall be responsible for confirming its own motions.
>
> (3) The defenses of lack of standing, untimely filing or service of the petition, and failure to join persons needed for just adjudication are waived if not raised by timely motion noted to be heard at the initial hearing, unless the court allows discovery on such issues.

4

(4) The petitioner shall move the court for an order at the initial hearing that sets the date on which the record must be submitted, sets a briefing schedule, sets a discovery schedule if discovery is to be allowed, and sets a date for the hearing or trial on the merits.

(5) The parties may waive the initial hearing by scheduling with the court a date for the hearing or trial on the merits and filing a stipulated order that resolves the jurisdictional and procedural issues raised by the petition, including the issues identified in subsections (3) and (4) of this section.

(6) A party need not file an answer to the petition.

The record suggests that the Neighbors did not note an initial hearing as required by RCW 36.70C.080. The Neighbors informed this court in its statement of arrangements that "no hearing was held below." While normally a party may waive the issue of standing if it was not noted and heard at the initial hearing, there was no initial hearing noted by the petitioner. Certainly, the parties could have waived the initial hearing and filed a stipulated order resolving jurisdictional and procedural issues. That was not done either. Instead, the parties stipulated to transfer the LUPA to this court where "review of this case may be conducted based upon the existing record." Nothing in the stipulation suggested that the parties may not raise the issue of standing. Hence, it is not surprising that the Neighbors do not argue that respondent Murray Franklyn waived the issue of standing.

Because Murray Franklyn is the respondent, it raised the issue of standing in its response brief. The Neighbors, without permission of this court, filed Greenwood's declaration at the same time it filed its reply brief. Had the Neighbors followed RCW 36.70C.080(1), which is mandatory, and noted an initial hearing, Murray Franklyn would have had to note a motion to address standing or risk waiving the issue. This would have provided the trial court an opportunity to exercise its discretion and allow parties to

supplement the record if warranted. See Lauer v. Pierce County, 173 Wn. 2d 242, 254, 267 P.3d 988 (2011) (record for judicial review may be supplemented by evidence of material facts to the superior court under RCW 36.70C.120(3) that were not made part of the local jurisdiction's record).

The Neighbors elected to bypass the mandatory initial hearing without securing by stipulation that defenses such as lack of standing were resolved. As the intervening party, they understood they had to satisfy RCW 36.70C.060. They elected to proceed based on the existing record at the time the superior court ordered the transfer of this case. Thus, I disagree with the majority's consideration of the Greenwood declaration. RAP 6.4 and RCW 36.70C.150(1) makes clear that this court's review will be based on an "existing record."

### Standing

For standing to bring a land use petition, the petitioner must show that they are a "person aggrieved or adversely affected by the land use decision, or who would be aggrieved or adversely affected by a reversal or modification of the land use decision." RCW 36.70C.060(2). A person is "aggrieved or adversely affected" by a land use decision when "the land use decision has prejudiced or is likely to prejudice that person." RCW 36.70C.060(2)(a). To satisfy this requirement, a petitioner must allege facts showing that they would suffer an "injury-in-fact" as the result of the land use decision. Thornton Creek Legal Def. Fund v. City of Seattle, 113 Wn. App. 34, 48, 52 P.3d 522 (2002) (citing Suquamish Indian Tribe v. Kitsap County, 92 Wn. App. 816, 829, 965 P.2d 626 (1998)). To show an "injury-in-fact," the plaintiff must allege specific and perceptible harm. Knight v. City of Yelm, 173 Wn.2d 325, 341, 267 P.3d 973

6

(2011). A party need not show a particular level of injury in order to establish standing under LUPA. Id. (citing Chelan County v. Nykreim, 146 Wn.2d 904, 935, 52 P.3d 1 (2002)). But where a plaintiff "alleges a threatened rather than an existing injury, he or she 'must also show that the injury will be immediate, concrete, and specific; a conjectural or hypothetical injury will not confer standing.'" Thompson v. City of Mercer Island, 193 Wn. App. 653, 662, 375 P.3d 681 (2016) (internal quotation marks omitted) (quoting Suquamish, 92 Wn. App. at 829).

The majority states that the Neighbors have satisfied this requirement because their "petition alleges several specific, threatened injuries: more traffic, more noise, worse views, less parking, and less wildlife habitat." It is important to note that the LUPA is challenging a BLA and does not involve any proposal or specific plans related to development on the eight lots. Thus, the Neighbors alleged threatened rather than existing injury and must show that the injury will *be immediate, concrete, and specific*. The Neighbors fail to do so.

The petition simply states

> 6.1     The Hollywood Hill Neighbors is an unincorporated group of homeowners who reside in the immediate vicinity of the parcels subject to the two challenged boundary lot adjustments. Each boundary lot adjustment will create new single-family housing lots of a size smaller than that allowed by the County code. The result of this increased density will be more traffic, more noise, worse views, less available on-street parking, and less wildlife habitat.
>
> 6.2     These impacts will worsen the quality of the life of the Hollywood Hill Neighbors members, because they currently enjoy relatively light traffic, a quiet environment, beautiful natural views, ample on-street parking, and substantial wildlife habitat on the affected lots, which the Hollywood Hill Neighbors members enjoy watching.

7

The Neighbors do not argue that, but for this BLA, residential homes could not be built on these eight lots.[5]  Nor does this BLA prevent the Neighbors from challenging the granting of a building permit in the future.  Nevertheless, the Neighbors are alleging that this land-use decision of granting a BLA will cause them harm because the single-family housing lots will be smaller than allowed by county code.

The Neighbors provided no information on the current traffic patterns in the area in relation to where they live and the eight lots.  Nor do they show how such traffic patterns could be specifically impacted by the potential addition of eight single-family homes to the area.  There is no information on the number of cars currently utilizing on-street parking or the number anticipated with the addition of the proposed homes, and no information on the current presence of wildlife and how it could be impacted by the building of eight homes in a neighborhood where newer lots are a minimum of 1.875 acres.  The Neighbors further provide no information on exactly what their "natural views" are and how they will be impacted.  Nor could they because the only issue before us is a BLA without any specifics of proposed building size and design.

Although Washington courts have previously held that increased traffic and lost views were sufficient injuries to confer standing, the petitioners in those cases provided more evidence to support their allegations of threatened injury than the Neighbors do here.  In Suquamish, members of the Suquamish Indian Tribe who owned land abutting a proposed 450-acre development including residential housing and a golf course next to the reservation were found to have standing due to the increase in traffic next to their

---

[5] King County maintains that it allows property owners who had legal lots that pre-existed the minimum lot-size requirements to build on their property as long as they meet other code requirements such as minimum lot width and minimum lot size for construction.

properties. 92 Wn. App. at 831. However, the petitioners submitted affidavits citing an Environmental Impact Survey which showed that the development would result in traffic on the surrounding roads shared with the petitioners increasing by 33 percent in some areas and up to 94 percent in others. Id. In Knight, the petitioner provided similar evidence to support her allegations that a planned development of 32 acres of residential lots 1,300 feet from her property would adversely affect her ability to exercise her senior water rights in the aquifer supplying both her property and the proposed development. 173 Wn.2d at 342-43. Knight presented evidence that the city was overdrawing its water rights and had insufficient water to serve the development and presented a "hydrogeologist's report detailing the adverse impact the subdivisions' water demand would have on her water rights." Id.

Even in cases without detailed studies on the injuries alleged, this court has required some showing of facts to support the claim of injury-in-fact sufficient to confer standing. In Asche v. Bloomquist, petitioners owned a home with views of Mt. Rainier and were found to have standing under LUPA where the county misapplied a zoning ordinance and approved a building nine feet higher than allowed, partially blocking the petitioner's mountain view. 132 Wn. App. 784, 792, 133 P.3d 475 (2006).

The record before us contains only descriptions of harms that can be claimed any time a property owner decides to develop what has been an undeveloped lot in a neighborhood. Conclusory, unsupported claims of increased traffic, more noise, worse views, less parking and less wildlife habitat, is not the immediate, concrete and specific showing required to establish standing to challenge a BLA that might result in the addition of eight single family homes.

9

Even when considering the Greenwood declaration, the Neighbors still fail to allege specific and perceptible harm sufficient to confer standing under LUPA. Greenwood lives 416 feet from the lots. The declaration goes on to list nine other residences where neighbors will share the same access streets as the lots.[6] The declaration states that increasing the density of the neighborhood by allowing new development of a single-family home on each of the eight Keesling lots "will increase traffic and increased [sic] noise from traffic." It states risks presented by traffic "will be amplified by the potential for 50 new cars" without explaining how or why that number of estimated cars was reached. The declaration similarly repeats the concern about increased "competition for on-street parking" forcing the Neighbors "guests to walk farther" when visiting the Neighbors' homes. Still absent is information about how much street parking is available in the neighborhood and the degree such parking is used now.

The majority describes the neighbor's claimed harms as "inconvenient travel" and "unsafe noise," but the Neighbors did not claim either, let alone show the injury was immediate, concrete, and specific. Claiming that there will be more noise and more traffic is not the same as claiming unsafe noise and inconvenient travel.

The declaration finally states that allowing development at a greater density on the Keesling lots than is permitted elsewhere in the neighborhood "will irrevocably alter the rural residential character of our neighborhood." Washington courts have previously declined to find standing where a petitioner's "sole interest is trying to enforce the

_____

[6] One of the residences is directly across the street from one of the lots and another is adjacent to one lot. One is 172 feet from the but can clearly see the lots. Two of the residences are about 700 feet away, but will have traffic from the lots pass by their house.

zoning protections in his neighborhood." Thompson, 193 Wn. App. at 663 (finding no standing where the petitioner only predicted that a proposed development would result in "houses that are inconsistent with the zone and neighborhood, overcrowd land, create a negative effect on open space, air, light, comfort and aesthetics, and diminish the value of surrounding properties like his own"); See Nykreim, 146 Wn.2d at 935 (intervenors who maintain that their sole interest is preserving the protections of zoning have not established that they are prejudiced within the meaning of an "aggrieved person" under LUPA).

As the petitioner, it was Neighbors' burden to follow RCW 36.70C.080(1) and note an initial hearing below. It did not do that and elected to proceed with a direct review to this court under RAP 6.4 based upon the existing record below. For that reason, I would not consider the Greenwood declaration. Regardless, the Neighbors have not met their burden of showing that their threatened injury will be immediate, concrete, and specific. Accordingly, the Neighbors have failed to establish an injury-in-fact that is specific and perceptible to confer standing under LUPA. I would dismiss the petition. Because the Neighbors have not satisfied RCW 36.70C.060(2)(a), there is no need to address RCW 36.70C.060(2)(b), the other basis on which Murray Franklyn challenges the Neighbors' standing.

_Colmen, J._

11